UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRY FOOTIT,

        Plaintiff,

v.                                    Case No. 04-C-459

JANE VAN DE HEY, et al.,

        Defendant.

**DECISION AND ORDER**

This § 1983 civil rights action is before me on a motion for summary judgment by the defendants. For the reasons that follow, I conclude on the undisputed facts that the action is without merit, the defendants' motion should be granted, and the action should be dismissed.

**FACTS**

Plaintiff Terry Footit filed this civil rights action on May 14, 2004, pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his rights under the First Amendment to the United States Constitution by retaliating against him for speaking out on an issue of public concern. More specifically, Footit, a member of the Winnebago County Board of Supervisors, claims that defendants Jane Van De Hey, the County Executive, and James Lauson, also a member of the Board, were upset over Footit's opposition to county funding for a wetland preserve ("the Heckrodt Project"). (Am. Compl. ¶ 14.) They retaliated, Footit claims, by calling for an investigation by the Winnebago County District Attorney into a possible misconduct in public office charge against

Footit arising out of his vote to allow promoters of entertainment events at the Winnebago County fairgrounds to ban carry-in items, including bottled water, at their events. Shortly after the issue of carry-in items was addressed by the Board, Footit, who also owned and operated Mineral Springs Water Company, entered into an agreement with Starshow Presents, Inc., the promoter of a country music festival at the fairgrounds, to provide bottled water for the first aid tent, backstage catering, and the VIP tent at its event. Footit's company was paid $1,562, plus three VIP passes for the festival valued at $605, for the water it provided. Van De Hey and Lauson told District Attorney Paulus that they believed Footit's vote on the water measure, in light of his company's relationship with Starshow, may have violated Wisconsin law prohibiting public officers from participating in the making of a public contract in which they have a private pecuniary interest. *See* Wis. Stat. § 946.13(1)(b). (Def. PFOF ¶¶ 7-22.)

Van De Hey and Lauson conveyed their suspicions to District Attorney Paulus in June or early July of 1998. (Def. PFOF ¶ 23.) Viewing the facts in a light most favorably to Footit, as I must at this stage of the proceeding, it appears that Van De Hey in particular was upset over Footit's opposition to the proposed County funding for the Heckrodt Project. She refused to reappoint him to the Oshkosh-Winnebago County Safety Building Committee when his term expired and falsely claimed that other members of the committee claimed he was a troublemaker. (Pl. PFOF ¶¶ 42-46.) Although both Lauson and Van De Hey were adamant in their meeting with District Attorney Paulus that Footit had engaged in wrongdoing, Van De Hey was "much more demonstrative than Lauson in her enthusiasm to have Footit investigated." (Pl. PFOF ¶¶ 61-62.) "Van De Hey expressed a desire 'to get' Footit 'once and for all,'" repeatedly described him as a "thorn" in her side who had caused her trouble on the county board, claimed he was "an obstructionist to her plans," and stated

2

"He's got to go down." (Pl. PFOF ¶ 63.) At the end of the meeting, Paulus said he would look into whether Footit had acted illegally.

Over the ensuing days and weeks, District Attorney Paulus received several telephone calls from Van De Hey and had several meetings with her in which she voiced her opinions about Footit. (Pl. PFOF ¶ 67.) In any event, on the basis of the information provided by Van De Hey and Lauson, District Attorney Paulus filed a complaint for a secret John Doe investigation in the Circuit Court for Winnebago County pursuant to Wis. Stat. § 968.26. (Decl. of James R. Scott, Ex. 101 at 0001.) Winnebago County Circuit Judge Robert J. Haase signed an order convening the proceeding and heard testimony from several witnesses on July 14, 1998. (Ex. 101 at 0005.) On October 26, 1998, District Attorney Paulus withdrew from the matter on the ground that he had a conflict of interest because of his previous relationship with Footit when Footit had served as Sheriff of Winnebago County. Milwaukee County District Attorney E. Michael McCann and John Reddin, his deputy, were appointed special prosecutors to replace Paulus. (Def. PFOF ¶ 30.) Although Footit never testified at the hearing, he was required to produce certain business records and he also answered questions about the records at a meeting with Deputy District Attorney Reddin at his attorney's office. He incurred attorneys' fees of $907. (Def. PFOF ¶¶ 31-33.)

Upon completion of the investigation, Deputy District Attorney Reddin issued a final report on March 2, 1999, in which he concluded there was insufficient evidence to prove Footit violated the law and recommended that the matter be closed without prosecution. (Ex. 101 at 0025.) In his report, Reddin focused on whether Footit had voted on a measure in which he had a private pecuniary interest in violation of Wis. Stat. § 946.13(2)(a). To establish a violation of § 946.13(2)(a), Reddin noted, the State would have to prove four elements: (1) that Footit was a

3

public officer or employee; (2) that he had a private pecuniary interest in a contract; (3) that the contract involved receipts and disbursements by the state or its political subdivision aggregating to more than $15,000 in any year; and (4) that Footit had either participated in the making of the contract or had performed a function requiring the exercise of discretion in regard to the contract in his capacity as a public officer or employee. (Ex. 101 at 0029.) Although Reddin concluded that it was clear Footit was a public officer and the contract with Starshow involved receipts in excess of $15,000, the evidence was insufficient to establish the remaining two elements. Given the testimony of other officials, including the County Corporation Counsel, Reddin concluded the State could not prove Footit's motion to change the "carry-in" policy constituted participation in the "making of a contract" or performance of a function "requiring the exercise of discretion in regard to a contract." (Ex. 101 at 0030.) More importantly, however, Reddin concluded that there was no evidence the Footit had a private pecuniary interest in the contract between the County and Starshow. The water provided under Footit's agreement with Starshow, Reddin noted, was for the first aid tent, the entertainers and the VIPs. The carry-in policy had no bearing on the need for this water since it would have been required in any event. Although the hot weather that actually occurred during the festival resulted in an increased demand for water at the first aid tent, Reddin concluded the ban on carry-ins likely had no impact on the increase. Finally, Reddin noted that there was no evidence that Footit had an agreement with Starshow at the time he voted on the carry-in prohibition. For all of these reasons, Reddin recommended that the matter be closed with no further action.

On March 8, 1999, Judge Haase entered an order adopting Reddin's recommendation. (*Id.*) After he was advised of the result, Footit petitioned the court to vacate the secrecy order so that he

could disclose the investigation and its result to the public. The court granted his request, and Footit disclosed the final report "so the public would know what the District Attorney's office was doing to silence a member of the Winnebago County Board." (Def. PFOF ¶ 36.)

Footit thereafter filed this action alleging that Lauson and Van De Hey violated his First Amendment right to free speech by retaliating against him for speaking out on a matter of public concern. (Am. Compl. ¶ 18.) He claims that the retaliation caused him to suffer "severe and permanent emotional, psychological and economic injuries" for which he seeks both compensatory and punitive damages from the individual defendants, as well as the County and its insurer. (Am. Compl. ¶¶ 19-20.)

**ANALYSIS**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential

5

element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In support of their motion for summary judgment, the defendants argue (1) the conduct alleged was not retaliatory; (2) it was not sufficiently adverse to be actionable under § 1983; and (3) they are entitled to qualified immunity as to the individual capacity claims. (Def.'s Br. In Supp. at 1-2.) I conclude, however, that whether the conduct of the individual defendants was retaliatory or not is irrelevant. Because of his status as an elected official, Footit's First Amendment retaliation claim fails as a matter of law. It also fails because no actionable adverse action was taken against him. And because I conclude he has no claim, I need not reach the issue of qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

In order to prevail on a First Amendment retaliation claim under § 1983, a plaintiff must prove that (1) his speech was protected under the First Amendment; (2) the defendants, acting under color of state law, took adverse action against him; and (3) his constitutionally protected speech was a substantial or motivating factor for the defendants' actions. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003). But neither the First Amendment, nor § 1983, was intended to shield politicians from the political process itself.

6

Thus, in *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the Court limited its holding that patronage dismissals of government employees violated their First Amendment rights to employees holding non-policymaking positions. The Court acknowledged that to prohibit a newly elected administration from replacing those holding policymaking positions in the previous administration with individuals who shared its views would interfere with the newly elected administration's ability to implement its policies and thereby undermine representative government. 427 U.S. at 367. Likewise, those who hold public office have little constitutional protection against their political opponents. As the fictional Mr. Dooley observed long ago, "Politics ain't beanbag."

That this is so, indeed that it must be so, should be obvious to any observer of American politics. Politics, in its less refined sense, is about winning and maintaining control over government. Merriam-Webster's Collegiate Dictionary 901 (10th Ed. 1999). In a democratic republic, such as ours, politicians get elected by convincing voters that they and the policies they support are better for their constituents than their opponents and the policies they support. They do this in large part by criticizing their opponents and their policies. As long as the criticism is not defamatory and made with malice, the law affords no protection to the person targeted. On the contrary, it is the right of the person criticizing a public official that is protected by the Constitution. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964). Even a false charge of criminal conduct against an official or candidate is constitutionally protected unless it is made with knowledge of its falsehood or with reckless disregard of whether it was false or not. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971).

7

In this case, of course, Footit is not suing simply because he and his policies were criticized. His lawsuit is based upon his allegation that Van De Hey and Lauson accused him of committing a crime. He further alleges that they did so because they were angry at the position he took on a matter of public interest, the County's funding of the Heckrodt Project. But Footit is hardly the first politician to be accused of a crime by a political opponent. Attacks on the character of those holding public office are as old as the country itself. To take just one recent example, former President Bill Clinton incurred millions of dollars in legal fees fending off an investigation by a special prosecutor who he argued was politically motivated and supported by members of the opposition party in Congress and other members of "a vast right wing conspiracy." Based on Footit's understanding of the law, President Clinton would have had a First Amendment retaliation claim against Republican members of Congress if he could show that their support for the investigation was motivated by his positions on issues of public concern. This is not the law, as cases from other jurisdictions clearly show.

In *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23 (1st Cir. 1996), for example, the former governor of Puerto Rico, having lost his bid for re-election, brought a § 1983 suit against elected members of the Puerto Rico Senate from the opposing political party, alleging that they violated his First Amendment rights by "rigging" legislative hearings to make it appear that he was involved in illegal activity and continuously labeling him as an assassin or murderer in public statements to the press, and on radio and television, in an effort to undermine his popularity with the electorate. The First Circuit affirmed the district court's dismissal of the action on the ground that the defendants enjoyed absolute legislative immunity for statements made and actions taken in the course of the legislative hearings. As to claims not barred by legislative immunity, the Court

8

upheld the district court's finding that there was "no First Amendment protection for 'a politician whose rights to freedom of speech, freedom of association, and freedom to disassociate [oneself] from unpopular views have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate.'" 75 F.3d at 34 (quoting *Barcelo v. Agosto*, 876 F. Supp. 1332, 1348 (D. P.R. 1995)).

Likewise, in *Camacho v. Brandon*, 317 F.3d 153 (2d Cir. 2003), the Second Circuit held that the termination of a City Council staffer because of the exercise of First Amendment rights of the opposition member with whom the staffer had a close professional and personal relationship was not actionable under § 1983 as a retaliatory discharge. Although the court found that the staffer had standing to assert the First Amendment rights of the council member who was allegedly retaliated against, it rejected the plaintiff's claim that such retaliation was actionable. In First Amendment retaliation cases, the court held, "there generally is no First Amendment violation when the plaintiff is a policy maker." 317 F.3d at 161. "Indeed, to hold otherwise," the court noted, "would subject to litigation all manners and degrees of politically motivated, retaliatory conduct directed at public officials." 317 F.3d at 162.

The same principle applies here. As an elected public official, Footit is not entitled to sue his political opponents just because he thinks their motivation for accusing him of misconduct was not pure. He can, of course, sue them in state court for libel or slander if they intentionally or recklessly defamed him. But that is not what Footit has claimed. He has not alleged that either Van De Hey or Lauson lied about him to Paulus or said anything that was not factually true. His claim is that they were politically motivated; they were angry at him because he opposed county

9

funding for the Heckrodt Project. That may be true, but because Footit is a policy maker, the motivation of his political opponents is irrelevant.

This is not to say that Footit has forfeited his First Amendment right to speak out on issues of public concern. As the Supreme Court observed almost forty years ago, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966). But as a policy-making official, Footit's vindication against his opponents, absent proof of libel or slander, must be found in the ballot box, not the courts. For this reason, his claim must be dismissed.

A second reason Footit's claim fails is that the neither Van De Hey nor Lauson took any actionable adverse action against him. They simply reported to the district attorney their suspicions that Footit had violated the law and asked him to investigate. It was District Attorney Paulus who chose to initiate a John Doe investigation into whether Footit had violated the law. Even if Van De Hey and Lauson could be held responsible for the commencement of the John Doe proceeding, it is hard to see how even that would constitute an adverse action against Footit. Footit was exonerated, and until he had the secrecy order lifted and disclosed it himself, the nature of the allegations against him was unknown to the general public.

In support of his claim, Footit relies on cases arising out of an employment context in which a public employer or supervisor has taken an adverse action against an employee in retaliation for the employee's protected speech. *See Wallace v. Benware*, 67 F.3d 655 (7th Cir. 1995) (deputy harassed by sheriff); *Fraternal Order of Police v. City of Hobart*, 864 F.2d 551 (7th Cir. 1988) (work hours for city police officers increased by city officials). But neither Van De Hey nor Lauson

10

exercised any supervisory authority over Footit. They made no effort to remove him from office or discipline him for misconduct. They had no control over the conditions of his employment. They simply reported their suspicions to the district attorney and asked him to investigate whether a crime had been committed, just as any citizen would have been entitled to do. In fact, it is not even clear they were acting under color of state law. The mere fact that both were county officials does not mean that they were acting under color of state law when they reported their suspicions to the district attorney. *See Polk County v. Dodge*, 454 U.S. 312 (1981) (public defender representing an indigent defendant not acting under color of state law).

It is true that at least in the employment context, very little is required to establish the "adverse action" element of a First Amendment retaliation claim. In *Rutan v. Republican Party of Illinois,* the Court suggested *in dicta* that "the First Amendment . . . protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'" 497 U.S. 62, 76 n. 8 (1990) (quoting *Rutan v. Republican Party of Ill.*, 868 F.2d 943, 954, n.4 (7th Cir. 1989)). And it is also true that First Amendment retaliation claims are not limited to only the employment context. *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). But it is in the employment context that retaliation claims most often arise and where something that by itself may seem rather trivial can combine with other slights to create an entire campaign of harassment. *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982). Moreover, regardless of the context in which it arises, the test for a First Amendment retaliation claim is whether the action of which

11

the employee complains is "sufficiently 'adverse' to deter the exercise of those rights." *Summers*, 226 F.3d at 820-21.

In at least two cases involving facts more egregious than the undisputed facts of this case, courts have found no adverse action sufficient to trigger § 1983 liability. In *Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999), a former city council member sued the municipal police chief and other city officials for violations of her First Amendment rights on the ground that they had retaliated against her opposition to the police chief's staffing proposal for his department by knowingly making false accusations against her in public, attempting to pressure the County Attorney into issuing formal charges, and instituting a recall effort against her. In holding that the action taken against her did not amount to actionable adverse action for purposes of a First Amendment retaliation claim, the court noted that the plaintiff was never arrested, indicted, subjected to recall, or formally reprimanded. The allegations contained in the recall petition were, the court concluded, "like those made to the County Attorney's Office and to the general public, mere accusations that are not actionable under § 1983." 174 F.3d at 512. Notwithstanding the barrage of public criticism directed at her from the police chief and other city officials, the court held that "the defendants' allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure." 174 F.3d at 514. It therefore affirmed that district court's grant of summary judgment.

Likewise, in *Mattox v. City of Forest Park*, 183 F.3d 515 (6th Cir. 1999), a former city council member and a former firefighter brought suit under § 1983 against the city, the police chief, the city manager, and a police officer, alleging First Amendment retaliation based on publication of a report and video detailing criminal and administrative investigations into the fire department.

12

The report and video contained many unflattering references to the council member, and were released shortly before the election in which she unsuccessfully sought to retain her seat on the city council. The council member alleged that the defendants designed the video and report to punish her for initiating the investigation of the fire department. On appeal from the district court's denial of the defendants' motion to dismiss based on qualified immunity, however, the Sixth Circuit held that plaintiffs had no federal claim and reversed. As to the claim of the plaintiff council member, the court held:

> As an elected public official, Mattox voluntarily placed herself open to criticism of her actions and views on political matters. A deliberate attempt to discredit Mattox, especially if initiated in retaliation for her actions in investigating the fire department, is perhaps an inappropriate and unfortunate occurrence, but on the facts of this case, it is not the type of "adverse action" against which the First Amendment protects. It is not equivalent to being fired by a government employer for expressing protected views. We do not think it would deter a public official of ordinary firmness from exercising his or her right to speak under the First Amendment. Public officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views. Mattox has not pleaded sufficient injury to make out a claim for First Amendment retaliation.

Mattox, 183 F.3d at 522.

In this case, the action of which Footit complains is far less egregious. Van De Hey and Lauson reported their concerns about Footit's conduct to the District Attorney in private. There is no evidence they ever publicly accused Footit of misconduct in office. Both District Attorney Paulus and his successor thought the concerns raised by the defendants to have sufficient merit to warrant an investigation. When the investigation was completed, Footit was advised no charges would issue because the prosecutors concluded the evidence did not support a charge. Footit chose to disclose the facts of the investigation to the public for his own reasons. Based on these facts and in light of the foregoing authority, I find that there was no adverse action taken against Footit

13

sufficient to trigger § 1983 liability. For this reason, too, the defendants' motion for summary judgment will be granted.

One final matter remains. Prior to the close of discovery, Footit sought leave to take the deposition of former District Attorney Paulus, who is presently serving a federal prison term in Florida for bribery in an unrelated matter. Under Fed. R. Civ. P. 30(a)(2), a party must obtain leave of the court in order to examine a person confined in prison. In an effort to avoid unnecessary expense, defendants opposed plaintiff's motion on the ground that even if Footit's allegations were true, he was not entitled to relief. I denied Footit's motion without prejudice until after the defendants' motion for summary judgment was decided. I conclude for the reasons stated above that a deposition of Paulus would not change the outcome. Footit simply has no viable First Amendment claim.

Accordingly, for the reasons stated above, the defendants' motion for summary judgment is granted and the plaintiff's action is dismissed.

**SO ORDERED.**

Dated this   29th   day of June, 2005.

> s/ William C. Griesbach
> William C. Griesbach
> United States District Judge